**Opinion filed January 15, 2026**



# In The

# Eleventh Court of Appeals

_____

## No. 11-24-00117-CR

_____

## BRANDY TAYLOR A/K/A BRANDY ANDERSON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 362nd District Court**
**Denton County, Texas**
**Trial Court Cause Nos. F22-4305-362, F22-4308-362, & F22-4309-362**

## O P I N I O N[1]

This appeal concerns, *inter alia*, the unfortunate death of a child whose demise directly resulted from abusive, egregious, and unnecessary conduct.

---

[1]Pursuant to Misc. Docket Order No. 24-9013 issued by the Texas Supreme Court on March 21, 2024, this appeal was transferred to us from the Second Court of Appeals. Therefore, as the transferee court, we must decide the issues raised in this appeal in accordance with the precedent of the Second Court of Appeals if its precedent conflicts with ours. *See* TEX. R. APP. P. 41.3.

Here, Appellant, Brandy Taylor a/k/a Brandy Anderson, was indicted in separate cause numbers for two counts of intentionally or knowingly causing bodily injury to a disabled individual by striking the victim with her hand and foot, respectively, both third-degree felonies, and one count of intentionally or knowingly causing serious bodily injury to a disabled individual by omission, by failing to provide food or medical care to the victim, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.04(a), (b)(2), (e)–(f) (West Supp. 2025). These causes were consolidated for trial.[2]

Appellant filed a speedy trial demand for each cause, which the trial court granted after a hearing. These causes proceeded to trial, and the jury convicted Appellant of (1) the first offense, (2) the lesser-included offense of causing bodily injury to a disabled individual with criminal negligence, a state jail felony, for the second offense, and (3) the third offense. PENAL § 22.04(e)–(g). After the punishment phase was concluded, the jury assessed Appellant's punishment at imprisonment in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ) for ten years and life, respectively, for offenses one and three, and two years in the State Jail Division of TDCJ for the second offense, with a $10,000 fine for each conviction. The trial court sentenced Appellant accordingly and ordered that her sentences be served concurrently.

Appellant raises three issues on appeal: (1) the trial court violated her due process right to a speedy trial; (2) the evidence is factually insufficient to support her convictions and the maximum sentences that were imposed for each conviction; and (3) the evidence is legally insufficient to support her convictions. We affirm.

---

[2]Appellant has appealed from each judgment of conviction, and they were originally docketed in our court as three separate appeals. However, based on our inquiry, and pursuant to Appellant's request, our Cause Nos. 11-24-00118-CR and 11-24-00119-CR were consolidated into Cause No. 11-24-00117-CR for purposes of appeal.

## I. *Factual Background*

L.A., the victim in this case, was sixteen when she passed away because of starvation and repeated physical abuse.[3] L.A. lived with her father, Larry Anderson, and Appellant, Anderson's wife. Appellant and Anderson have six children together; however, L.A. was the only child in the household who was not Appellant's biological child. During the COVID-19 pandemic, L.A. and all the children, except the oldest, were homeschooled. Anderson worked long hours, while Appellant remained home to care for the children. Appellant became frustrated with L.A., and at some point, she texted Anderson: "[L.A.] definitely has some demonic spirits in her. I ain't never dealt with anything like this before." Records from a dental visit that L.A. attended in September 2020 indicate that, at that time, she weighed one hundred forty-four pounds.

On October 6, 2021, Anderson took L.A. to the Texas Health Resources Alliance Hospital in Fort Worth. L.A. was unresponsive, lacked a pulse, and was not breathing; medical personnel there observed that she was emaciated, weighed sixty to seventy pounds, and was covered in bruises and wounds in various stages of healing, including a black eye. According to Marisol Suarez, the hospital's night receptionist, L.A. was wearing dirty pajamas and had "really matted hair." Based on her weight, Suarez believed that L.A. was around eight years old. L.A.'s eyes were rolled back, and she was "very clammy," "very cold," and "very pale, almost gray." Anderson told medical personnel there that L.A. was bulimic. Video footage of L.A. being brought into the hospital was admitted and published to the jury.

Paramedic Ashley Heavener, who was on duty in the emergency room that evening, described L.A. as "limp" and "skin and bones" with hair missing from her scalp. Upon removing L.A.'s clothes, Heavener observed a handprint on the left

---

[3]To protect the identities of the child victim and her siblings, we refer to them by pseudonyms or initials. *See* TEX. CONST. art. I, § 30(a)(1); TEX. R. APP. P. 9.10(a)(3).

3

side of L.A.'s torso, and bruises, wounds, and scars that were in various stages of healing. There were long marks on L.A.'s hips that appeared as if she had been dragged, and she was so thin that "[she] could see every bone in [L.A.'s] body pretty much." The vertebrae in her back were visible and protruding, there were bruises or wounds along her spine, and she had a black eye and a bruised chin. In addition to the injuries observed by Heavener, L.A. also presented with several chipped teeth, a contusion on her other eye, bruising to her left arm and ribs, bedsores, a laceration to her tongue, and scarring "everywhere." Photographs depicting L.A.'s extensive injuries were admitted and published to the jury.

L.A.'s body temperature was "roughly 77 degrees," far below one's normal body temperature of 98.6 degrees. Kimberly Watkins, a nurse on duty that night, described this as "catastrophic" and testified that a person's body temperature can only drop to that level within a few hours if they are deceased. Watkins opined that L.A. was deceased before she arrived at the hospital. L.A.'s glucose level was measured at ten, a critical reading according to Watkins—because the normal range is 70 to 110. Watkins testified that a glucose level of ten is "unsustainably low." Watkins observed severe bruises and wounds at various stages of healing all over L.A.'s body and that L.A. appeared younger than her reported age of sixteen because she only weighed around seventy pounds. She also noticed that L.A. had a black eye, a contusion on the other eye, a laceration to her tongue, several broken teeth, substantial scarring all over L.A.'s body, a severely swollen hand, and emaciation— Watkins said that she "could . . . count every rib [on her body] or see the bones protruding."

Watkins testified that she had "overwhelming concerns" that L.A. had been abused. Anderson provided L.A.'s medical history to the medical staff, which consisted of recent bulimia and prior sexual abuse. Based on her medical training and experience, Watkins did not find L.A.'s provided history to be consistent with

her appearance at the hospital because L.A. did not present any common findings that would be consistent with bulimia. According to Watkins, L.A. was not well cared for.

Douglas Day, a detective with the Fort Worth Police Department, responded to the call from THR Alliance and spoke with Anderson. L.A. was being treated at the time. Anderson's demeanor was calm which Detective Day found to be unusual. Detective Day viewed L.A.'s body postmortem and noted various injuries and bruises all over her body, including a black eye. The bones on L.A.'s torso and back protruded prominently and he believed that she weighed around sixty to seventy pounds. Detective Day also observed Appellant at the hospital; he noted that she was calm when she arrived and calm when she was told that L.A. had passed.

During cross-examination, Detective Day agreed that Anderson had told him (1) L.A. was bulimic and had lost a significant amount of weight around July 2021, (2) she had been sexually abused in her biological mother's home, (3) L.A. shared a room in Anderson's house with one of his daughters, (4) one of his daughters saw L.A. inserting a pencil down her throat to induce vomiting, and (5) L.A. had fallen the week before and was injured. He also testified that Anderson told him that when Anderson arrived home on October 6, L.A. was walking and talking and had passed out later that night. According to Detective Day, this was a case of neglect or abuse.

Alissa Wells, a nurse on the Teddy Bear Transport Team, a pediatric transport team attached to Cook Children's Hospital in Fort Worth, responded to THR Alliance's request that night to transport L.A. to Cook Children's (L.A. was ultimately too unstable to be transported), and she testified similarly about L.A.'s physical condition. Wells testified that L.A.'s core temperature was in the seventies, critically below a person's normal temperature range. She observed that L.A. exhibited numerous injuries: "[l]ots of bruising, missing front teeth, a black eye, one hand was more swollen than the other, abrasions on the knees and burn marks on the

5

legs." Wells had received L.A.'s reported medical history that she was bulimic or anorexic. Wells testified that in her experience and medical training, L.A.'s overall condition appeared to be consistent with physical abuse, not with bulimia or anorexia. Wells testified that L.A.'s weight was 31.1 kilograms, or between sixty and seventy pounds, which was underweight for her age and medically concerning. Wells's report stated that, according to Anderson, (1) L.A. had a history of anorexia, (2) he had found her unconscious after work and brought her to the hospital, (3) he suspected her mother's boyfriend had abused her, (4) he had recently been granted custody of L.A., and (5) her bulimia began in June.

Ultimately, after life-saving measures proved to be ineffective, L.A. was pronounced deceased by medical staff at THR Alliance.

Dr. Sam Andrews, a deputy medical examiner with the Tarrant County Medical Examiner's Office at the time of L.A.'s death, performed L.A.'s initial autopsy and listed her cause of death as an eating disorder, not otherwise specified, and the manner of death as natural.[4]

After this initial autopsy, K.A., who is L.A.'s younger brother and Appellant's son, spoke to several CPS workers and described L.A.'s living conditions immediately before her death. K.A. told CPS worker Chantelle Worrell that L.A. "got tore up," received a black eye after being punched by Appellant, slept in the bathroom on the floor, that the bathroom doorknob was "reversed" so that it could be locked from the outside, and that L.A. would scream for help. Similarly, K.A. told CPS worker Salynda Garcia that L.A. slept in the bathroom and that Appellant had struck L.A. on the head, making her head bleed. Lastly, K.A. told CPS worker Makayla Perry that Appellant punched L.A. in the eye, that Appellant was concerned

---

[4]Dr. Andrews had left the employ of the Tarrant County Medical Examiner's Office before Appellant's trial commenced and was not presented as a witness by either party.

law enforcement would discover the abuse, that Appellant and Anderson told him not to talk about it, and that L.A. lived in the bathroom and drank toilet water.

Samantha Torrance, a forensic interviewer at the Tarrant County Children's Advocacy Center (CAC), conducted two forensic interviews with Lyr. A., who is L.A.'s younger sister and Appellant's daughter. Torrance explained that it is rare for a child who has experienced abuse to talk about it early on. Torrance testified that during the first interview, Lyr. A., who was three at the time, could not differentiate between the truth and a lie, and she did not make an outcry or disclosure about L.A. being abused. Torrance conducted a second forensic interview with Lyr. A. when she was four; Torrance explained that additional interviews are avoided unless the child makes new statements or provides additional information that was not disclosed in the first interview. Torrance testified that at this interview it was unclear whether Lyr. A. could differentiate between the truth and a lie, but that Lyr. A. agreed to talk about "things that are real and things that really happened." During this interview, Lyr. A. made an outcry that L.A. had been abused—beaten—by Appellant and Anderson.

Khalisha Bond, a CPS investigator, testified that Appellant told her that L.A. had not received any type of medical or psychiatric care before she died.

Maegan Self, another CPS investigator, testified that Appellant provided medical and dental records for the children. L.A.'s dental records were signed by Appellant as "parent/guardian." Records from the online public school that L.A. attended in 2021 also noted Appellant as her "parent/guardian." Self testified that Appellant did not provide her with any medical records for L.A., but only provided two documents, each bearing a receipt date of September 20, 2021—a court order giving custody of L.A. to Anderson and a birth certificate listing Anderson as L.A.'s father. According to Self, Appellant told her that she had attempted to obtain counseling services for L.A. but was unable to do so because she was waiting for the

7

custody documentation that would show she was authorized to secure those services for L.A. Self testified that at a CPS hearing after L.A.'s death, Appellant stated that she first became concerned about L.A.'s condition in June 2021 because "her face was -- had gotten smaller," and that Mi. S. was receiving counseling services because she had been sexually assaulted as a child. Appellant stated that she did not believe the wounds on L.A. were bedsores, and that, although she had called some mental health hospitals, she had never taken L.A. to a medical provider after she noticed L.A.'s health deteriorating. Appellant also stated at the hearing that L.A. had stolen food and fallen several times, Appellant saw L.A. every day, and from July until her death in October L.A. never left their home. Self concluded from the evidence presented at the CPS hearing and her investigation that there was reason to believe that L.A. had been abused or neglected.

Detectives Alex Hoeppner and Martha Pellerin with the Fort Worth Police Department, Crimes Against Children Unit, were assigned to investigate the circumstances of L.A.'s death. They assumed responsibility for the case from Detective Mitchell Ellis, the initial lead investigator; Detective Pellerin testified that she did not believe that Detective Ellis had conducted a thorough investigation. Detectives Hoeppner and Pellerin received additional and more detailed information about L.A. and her home life from the CPS investigations, interviews of L.A.'s family members, and the statements made by some of the children to CPS workers. Based on this new information, they conducted additional interviews with family members and neighbors and reviewed medical records and crime scene photographs.

Although an autopsy had been performed previously by Dr. Andrews, Detectives Pellerin and Hoeppner presented the supplemented case file to Dr. Kendall Crowns with the Tarrant County Medical Examiner's Office. Detective Hoeppner ascertained that Dr. Andrews had performed this autopsy when only statements from Appellant and Anderson were made available to him. In August

2022, Detective Hoeppner provided additional information to Dr. Crowns, including CPS records, the video from the hospital that showed L.A. was unable to walk, and the post-mortem photographs of L.A.'s body; he also met with Dr. Crowns. Detective Hoeppner testified that he had not "re-presented" a case to the medical examiner before, but he decided to do so in this case because he did not believe that the parent-provided medical history of bulimia matched L.A.'s condition as shown in the photographs and because a proper medical diagnosis of bulimia was lacking.

Detective Hoeppner executed a search warrant for Appellant's home in Justin (the family was no longer living there due to the parents' arrests and the children's placements in other homes); he specifically searched for a bathroom doorknob that had been reversed to lock from the outside. He testified that he discovered such a doorknob that was not reversed but appeared to have been changed because there was paint missing around the doorknob. Based on his investigation, he believed that Appellant failed to secure medical assistance for L.A. when she assumed control or custody of L.A. and thus had a duty to do so. He testified that although no formal diagnosis of a mental or physical health issue had been rendered for L.A., he believed that she met the statutory definition of a disabled individual for purposes of the charged offenses. *See* Penal § 22.04(c)(3)(B). Detective Pellerin also testified that she believed that L.A. was disabled based on statements they had received from family members, Appellant, and Anderson, and from L.A.'s age and the numerous injuries that she exhibited.

After this additional information was discovered, a subsequent review of L.A.'s autopsy was performed by Dr. Crowns. After extensively reviewing the autopsy materials and the additional investigative information accumulated by CPS workers—including K.A.'s outcries—Dr. Crowns formed the opinion that L.A.'s cause of death was starvation, and the manner of death was homicide.

9

Dr. Crowns testified that Dr. Andrews's conclusion of L.A.'s cause of death as "eating disorder, not otherwise specified" meant that the autopsy findings did not specifically fall within the categories for bulimia or anorexia. Dr. Crowns testified that he disagreed with this conclusion, but he also stated that he understood that Dr. Andrews did not possess the same information as Dr. Crowns did when he reviewed the autopsy materials. Dr. Crowns also pointed out that Dr. Andrews's report included references to a statement by Anderson that L.A. had collapsed in front of him, which Dr. Crowns found to be inconsistent with the presence of L.A.'s bedsores. Dr. Crowns testified that although Dr. Andrews's report stated that L.A. was not formally diagnosed with bulimia but did appear to meet some of the criteria for that condition, Dr. Crowns understood that Appellant or Anderson were the source of the information that L.A. allegedly had bulimia. Dr. Crowns amended the autopsy report to state, based on his conclusions, that L.A.'s cause of death was starvation, and the manner of death was homicide. He testified that he based the need for this amendment on the combination of his medical findings and review of other investigative information, some of which was not available to Dr. Andrews at the time he performed L.A.'s autopsy.

K.A. was ten at the time of trial, which began approximately two and one-half years after L.A.'s death. K.A. was asked about all his siblings; he acknowledged each of them, but when asked about L.A., he responded: "Don't talk about that" because "I'm sad" "because she passed away." He stated that L.A. passed away because "[his] parents whooped her" "with a belt and on the metal part. And it always been hurting her and punching her in her eye. Where her eye was purple." He stated multiple times that "[m]om" punched L.A. in the eye. He testified, "I used to always see [L.A.] when she was hurt when I was little. I used to always hear screaming in the bathroom. They used to always whoop her for no reason." He clarified that "they" were "[m]om and dad," and testified that he would hear L.A.

10

yelling "[h]elp me" from the bathroom but "[n]obody ever cared." He testified that, "They made her sleep by the toilet" and "they kept lying and told me not to tell anyone" because "they didn't want to go to jail." According to K.A., "all they gave her was toilet water and a sandwich." He testified that "when she was little she -- she was loved. But when she grew up, she started getting hurt" by "[m]om and dad." He saw L.A. vomit several times "when she was throwing up blood, because they always used to beat her in her mouth." L.A. only ate sandwiches and that "they never let her eat anything else"; he was able to eat "[p]izza, hot dogs, everything" but L.A. was not allowed to eat the same things. He testified that L.A. was locked in the bathroom and that Appellant and Anderson "turned the doorknob the other way."

On cross-examination, K.A. agreed that he had told his brother, Mau. S., that, "[T]hey are making me say bad things about my mom and dad." He remembered a time when L.A. fell in the kitchen and her head was bleeding, and he also saw her fall several other times. He testified that he had been treated at a mental hospital on four occasions since he was eight, most recently for ten days because he threw his sister, Lyr. A., over the railing because he was hearing voices and sometimes would hear voices that "told him what to do."

L.A.'s younger sister, Lyr. A., was six at the time of trial. She testified that L.A. was in jail, and that her parents (Appellant and Anderson) "just wanted her to go to jail, because she was doing what she was asked, but they kept hitting her." They hit her "with shoes and the belt . . . because they don't like her." Lyr. A. testified that L.A. slept in the bathroom because "they don't want her sleeping with us," and that "my parents said if [L.A.] doesn't stay in there, they're going to keep hitting her." Lyr. A. testified that her grandmother and her parents told her not to talk about L.A. Lyr. A. said that the police came to arrest Appellant and Anderson and that "both of them had to go to jail . . . because [L.A.] did nothing, but what –

11

my parents did something . . . they been spanking me and her." Lyr. A. also testified that L.A. had to drink from the toilet. According to Lyr. A., L.A. was skinny because "[m]y parent[] haven't been feeding her that much."

During cross-examination, Lyr. A. was shown photographs of her siblings, but she testified that she did not recognize them. She testified that she remembered speaking with Torrance in the past, and, in answer to the question, "And back then you were not able to tell the difference between telling the truth and telling a lie, because you were only three, right?" She responded: "Yes." She testified that she told her older sister, Mi. S., everything that had happened to L.A., and that Mi. S. told her brother, K.A., but that he never saw anything. She said that K.A. told her what to say, but clarified on redirect that K.A. told her to "ask the judge if he's nice or not," but did not tell her what to say about what happened to L.A. She testified that she and K.A. discussed what had happened to L.A., that "she got beat up. We don't know why, but she had been doing what she was told." Lyr. A. also stated that she believed that L.A. was alive and in jail.

Lara Hastings, a psychologist, performed psychological evaluations on Appellant, Anderson, and several of the children, including K.A. and Lyr. A. She testified that sometimes children "may not be willing to tell you things about themselves that are important. With little ones they -- there's a lot they wouldn't know or be able to articulate." She stated that "[w]ith older ones there may be some stuff they know that they don't want you to know." Hastings interviewed Lyr. A. when she was four, after L.A.'s death, and testified that Lyr. A. told her, "My mom and dad killed [L.A.]." Hastings stated that if Lyr. A. testified that L.A. was dead and in jail, "a young child may be confused about where somebody is if they are separated from them and have been for a long time, especially if they've been separated from them since they were under five years old" and that Lyr. A.'s

12

conflicting testimony did not necessarily mean she was lying because she is a young child.

Dr. Suzanne Dakil, an assistant professor of pediatrics and the medical director for the REACH clinic at the University of Texas Medical Center at Children's Health, consulted with CPS and law enforcement about the case. She opined that L.A.'s initial history as provided by Appellant and Anderson—that L.A. was bulimic and had fallen—was not consistent with L.A.'s physical appearance at the hospital, and that she did not believe L.A. was walking, talking, and eating on October 6 as Appellant and Anderson had described. She testified that someone who is hallucinating and immobile cannot care for themselves. Based on L.A.'s dental records from the previous year, L.A. had weighed one hundred forty-four pounds, but only around eighty pounds on the day she died. According to Dr. Dakil, it would have taken several weeks for L.A. to have lost this much weight. She also opined that L.A.'s injuries were not accidental, but rather were consistent with physical abuse, and that her appearance was not consistent with bulimia. She testified that she did not agree with Dr. Andrews's opinion about L.A.'s manner and cause of death but instead agreed with Dr. Crowns's opinion. After her review of the medical records, documentation, photographs, statements, and everything else presented to her, it was her opinion that L.A. "was repeatedly beaten and starved," and that "her death could have been prevented with appropriate medical care and that there are concerns for physical abuse and neglect."

On cross-examination, Dr. Dakil agreed that L.A. had been sexually abused multiple times when she was preadolescent and that tragic events such as this can lead to eating disorders. She was aware that Appellant had contacted the CAC regarding therapy services for L.A. but understood that L.A. was never actually taken to the CAC for such services.

13

Dr. Dakil testified that even if L.A. was bulimic, her conditions—hallucinating, immobility, and being a minor—classified her as someone in need of a caretaker who would obtain medical assistance for her. She testified that social isolation was an important aspect of her assessment of the case because it limited other people from noticing that anything was wrong with L.A.

Mi. S., Mal. S., and Mau. S., Appellant's children, were fifteen, sixteen, and seventeen, respectively, at the time of trial. Mi. S. and Mal. S. testified that L.A. shared a bedroom with Mi. S. and Lyr. A. All three teenagers testified that Appellant and Anderson never used physical violence to discipline the children, including L.A., but rather, as a means of discipline, would take privileges or electronics from them. Mi. S. and Mau. S. testified that K.A. and Lyr. A. are untruthful and are prone to lie. They also testified that earlier on October 6, L.A. was walking around the house and talking normally. Mal. S. testified that he did not see L.A. that day because he spent most of the day in his room, but he had seen her the day before and she was walking and talking normally. All three teenagers testified that L.A. was not covered in bruises or marks, Anderson worked long hours, and Appellant stayed home to care for the children.

Mi. S. testified that she once saw L.A. shove a pencil down her throat, soon before L.A. passed away, and that Mi. S. told Appellant what she had observed. According to Mi. S., the month before L.A. died, Mi. S. helped Appellant supplement L.A.'s meals with protein shakes once per day. Mi. S. also testified that she saw L.A. fall once.

Mau. S. testified that, during a CPS visit in 2022, K.A. told him that he was being forced to say bad things about Appellant and Anderson. Mau. S. agreed that he understood that CPS had terminated scheduled visits between he and K.A. because he would tell K.A. not to talk about L.A.

14

Anderson testified that L.A., K.A., and Lyr. A. are his biological children. He stated that when he came home from work on October 6 that L.A. collapsed when she stood to greet him. He testified that he saw L.A. every day and that she was able to talk and walk and was never immobile. He "guesstimated" that L.A. was bulimic because Mi. S. told him she saw L.A. self-induce vomiting with a pencil. Appellant told him that she had attempted to enroll L.A. in therapy and that he understood from Appellant that L.A. was hallucinating. According to Anderson, L.A.'s weight loss "wasn't that dramatic" because she had always been slim and that she was just "slimming down" more than usual. He claimed that L.A. weighed eighty-eight pounds at her death, and he did not believe that L.A. ever weighed one hundred forty-four pounds. He testified that Appellant ate the same food as everyone else and ate meals with everyone at the dinner table.

Anderson testified that L.A. had a chipped tooth and a bruise above her eye from a fall he did not witness but that Appellant had described to him. He said that L.A. never had a black eye. He agreed that while L.A. was in the hospital he texted his sister and Appellant that he was going to jail. He agreed that he and Appellant did not take L.A. to a mental health facility, a hospital, or any medical provider for care between September 2020 and October 2021. He testified that he had never seen the bruises on L.A.'s arms and legs and did not know how she got them. He denied that (1) L.A. ever slept on the bathroom floor, (2) he changed the bathroom lock to its normal position before the police came to search their house, (3) L.A. was not allowed to eat the type of same food as the other children, (4) he and Appellant repeatedly beat her and stomped on her legs, and (5) Appellant hit her causing a black eye to develop.

Appellant denied committing any of the charged offenses. She agreed that although she told law enforcement that in August or September 2021, she began to suspect that L.A. was bulimic, L.A. never received a formal medical diagnosis for

that condition. She agreed that Anderson had been granted custody of L.A., and that a birth certificate also stated that Anderson was L.A.'s father prior to the issuance of the custody order. She agreed that she contacted the CAC about therapy services for L.A. but never made an appointment; she claimed this was because she did not have the authorization to obtain such care for L.A. because she was not L.A.'s biological parent or legal guardian, and L.A. was not in her care, custody, or control. She also agreed that she took L.A. to the dentist in September 2020.

Appellant stated that although in September and October 2021, L.A. was hallucinating and losing weight, L.A. "was not showing any life threatening symptoms." She agreed that by September 16, she knew L.A. was hallucinating. She testified that L.A. fell not because of her hallucinations and weight loss, but because she was not able to sleep well. Initially, Appellant testified that she did not see L.A. the morning of October 6, but when confronted with her statements from a recorded interview with police, she agreed that she had told law enforcement that L.A. came downstairs that morning and had oatmeal and sausage patties for breakfast. She testified that when she left the house that day to go to Mau. S.'s football game, L.A. had a black eye and bruises on her forehead and legs. According to Appellant, L.A. was walking and talking in the house the day before she died and was eating three meals a day.

Appellant denied that L.A. ever stayed or "lived" in the bathroom. She also denied that the bathroom doorknob had ever been reversed to lock from the outside. She agreed that the autopsy photographs showed that L.A. bore bruising all over her body and that her condition clearly indicated a need for medical treatment; however, she denied seeing L.A.'s extensive bruising prior to viewing the autopsy photographs. She denied punching L.A. in the eye or stomping on her feet or legs or that L.A. was immobile. She testified that K.A. was untruthful when he testified and that he had been instructed by CPS workers to testify falsely. She stated that

16

she did not believe L.A.'s wounds that Drs. Crown and Dakil characterized as bedsores were in fact bedsores.

Appellant testified that the police requested that she return to the hospital and that she was the only person who was present at THR Alliance after L.A. passed away who was related to L.A. but clarified that she "wouldn't say [she] was related." When asked whether it was accidental that L.A. was covered in bruises and later died, Appellant testified: "Sir, I tried to do the best that I could." When asked: "a sixteen-year-old girl covered in bruises dies at your house and you're telling us that you did everything you could to keep that from happening? Yes or no?" Appellant responded: "I didn't have experience, but I -- from a mother's perspective, I did try. I was overwhelmed. I was frustrated. That's why I asked her mother for help. That's why I asked could we put her in a mental facility for a little bit, because I -- I didn't know what to do."

## II. *Appellant's Speedy Trial Demand*

Appellant was arrested on December 13, 2022, and confined in the Denton County Jail pending trial. She was indicted in three separate causes for injury to a disabled individual, which were consolidated for trial. Her bonds totaled $375,000, and the trial court denied Appellant's requests for bond reductions. Consequently, Appellant remained confined until her trial date.

Appellant's arraignment was set on January 26, 2023. On that date, Appellant and her trial counsel agreed, and they signed a reset form, to reset her case to the "Announcement Docket" for March 16. Appellant and her trial counsel later agreed to and signed two additional reset forms—from March 16 to April 20 for another setting on the "Announcement Docket," and from April 20 to May 19 for a pretrial hearing. On March 27, Appellant filed a motion to suppress Dr. Crowns's addendum to L.A.'s autopsy report. The trial court heard the motion over three dates: May 19, July 14, and September 18, and ultimately denied it.

On September 28, Appellant moved for a speedy trial and requested that her trial be set for December 11, 2023. On October 17, the trial court held a hearing to address Appellant's motion. At the hearing, the State contended that the prosecutors assigned to these cases were scheduled to be in trial on the requested date to prosecute older cases that involved individuals who were confined and awaiting trial. The State proposed that the first available date without existing scheduling conflicts for them or the trial court was February 12, 2024. After the hearing, the trial court granted Appellant's motion, but set her trial for February 12, 2024, rather than her requested date of December 11, 2023. Appellant did not object to the trial court's rulings or to the February 12, 2024, trial setting.

On February 12, Appellant's trial was called, voir dire was conducted, and, after peremptory strikes were exercised and challenges for cause were addressed, an insufficient number of panel members remained in which to empanel a jury. The trial court attempted to secure another jury panel for the following day but was unable to do so. As a result, Appellant's trial was reset for March 18, which was the next available jury trial setting. Appellant objected to this trial date on the basis that the trial court had signed an order for Appellant's trial to commence on February 12, and Appellant did not agree to a reset. The trial court inquired if Appellant desired to proceed immediately to a bench trial, which Appellant rejected and again demanded a speedy jury trial. The trial court responded that the next available date for a jury trial was the reset date of March 18, and, over Appellant's objection, Appellant's trial was reset to that date.

On February 20, Appellant moved to dismiss all charges based on the alleged failure of the trial court to provide a speedy trial. The trial court denied her motion the same day. On March 18, voir dire was conducted, a jury was empaneled and sworn, and trial proceeded.

By our count, nine months and fifteen days elapsed between Appellant's arrest and the filing of her motion for a speedy trial. Ten months and three days elapsed between her arrest and the trial court's grant of her speedy-trial motion. Prior to filing her speedy-trial motion, Appellant had agreed to four months and twenty-three days of postponements and resets. Appellant's first trial setting was fourteen months after her arrest and, all together, fifteen months and five days elapsed between Appellant's arrest and when the jury was empaneled and sworn.

### III. *Analysis*

### A. *Speedy Trial Demand*

In her first issue, Appellant contends that her due process right to a speedy trial was violated.

### 1. *Standard of Review*

A trial court's ruling on a speedy-trial complaint is reviewed under a bifurcated standard. *Gonzales v. State*, 435 S.W.3d 801, 808–09 (Tex. Crim. App. 2014); *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008) (citing *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002)). In this regard, we review a trial court's determination of questions of law de novo to determine whether there is sufficient presumptive prejudice to proceed to a *Barker*[5] analysis and the weighing of the *Barker* factors; we review factual issues under an abuse of discretion standard. *Gonzales*, 435 S.W.3d at 808–09; *Cantu*, 253 S.W.3d at 282.

A review of the *Barker* factors necessarily involves factual determinations and legal conclusions, but "[t]he balancing test as a whole . . . is a purely legal question" that we review de novo. *Cantu*, 253 S.W.3d at 282 (alterations in original) (quoting *Zamorano*, 84 S.W.3d at 648 n.19). Under an abuse of discretion standard, we view

---

[5]*See Barker v. Wingo*, 407 U.S. 514 (1972) (holding that a court's evaluation of a speedy-trial complaint includes a consideration of the length of delay, the reason(s) for delay, to what extent the defendant has asserted this right, and any prejudice suffered by the defendant).

all the facts in the light most favorable to the trial court's ruling. *Id.* We defer not only to a trial court's resolution of disputed facts, but also to the reasonable inferences drawn from those facts that are necessary to support the trial court's findings. *Balderas v. State*, 517 S.W.3d 756, 767–68 (Tex. Crim. App. 2016); *Gonzales*, 435 S.W.3d at 808–09; *Kelly v. State*, 163 S.W.3d 722, 726 (Tex. Crim. App. 2005). In making its determinations, the trial court may believe or disbelieve any evidence that is presented to it provided there is a reasonable and articulable basis for doing so. *Kelly*, 163 S.W.3d at 728.

We review a trial court's ruling on a motion to dismiss that is based on an alleged speedy-trial violation "in light of the arguments, information, and evidence that was available to the trial court at the time it ruled." *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003). Where, as here, the trial court has denied the motion to dismiss, we presume that the trial court resolved any factual disputes or credibility determinations in favor of its ruling, and we defer to the implied findings of fact that the record supports. *See Cantu*, 253 S.W.3d at 282 (citing *Zamorano*, 84 S.W.3d at 648). In the end, we must uphold the trial court's ruling if it finds support in the record and is correct under any applicable theory of law. *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003).

### 2. *Application*

The Sixth Amendment to the United States Constitution, made applicable to state criminal prosecutions through the Fourteenth Amendment, provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI; *see also Gonzales*, 435 S.W.3d at 808. The Texas constitution, as well as Article 1.05 of the Code of Criminal Procedure, provide the same guarantee. TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05 (West 2005); *Cantu*, 253 S.W.3d at 280 n.16 (noting that the right to a speedy trial "exists independently of the federal guarantee, but this Court analyzes a claim of a

denial of the state speedy-trial right under the same four" factors set out in *Barker*). To trigger a *Barker* speedy-trial analysis, the defendant must make a threshold showing that the "interval between [the] accusation and [the date of] trial has crossed the threshold [that separates] ordinary from 'presumptively prejudicial' delay." *Gonzales*, 435 S.W.3d at 808 (quoting *Doggett v. United States*, 505 U.S. 647, 651–52 (1992)). If the defendant makes a showing of presumptive prejudice, courts must then consider and weigh each *Barker* factor. *Id.* (citing *State v. Munoz*, 991 S.W.2d 818, 821–22 (Tex. Crim. App. 1999)); *Murphy v. State*, 280 S.W.3d 445, 452 (Tex. App.—Fort Worth 2009, pet. ref'd).

After a person is arrested or charged, a speedy-trial complaint is triggered by the passage of time that is deemed to be unreasonable enough under the circumstances to be "presumptively prejudicial." *Barker*, 407 U.S. at 530; *United States v. Marion*, 404 U.S 307, 313 (1971). Post-accusation delay that approaches one year from the date the person is arrested or charged until trial commences "marks the point at which courts deem the delay [to be] unreasonable enough to trigger the *Barker* [i]nquiry." *Doggett*, 505 U.S. at 652 n.1.

When there is a threshold showing of presumptive prejudice, courts must weigh and balance the *Barker* factors together based on the conduct of the prosecution *and* the defendant to determine whether an accused has been denied her right to a speedy trial. *Barker*, 407 U.S. at 530; *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017); *Cantu*, 253 S.W.3d at 281; *Dragoo*, 96 S.W.3d at 313. The *Barker* factors focus on (1) the length of the delay, (2) the reason(s) for the delay, (3) whether the defendant effectively asserted her speedy-trial right, and (4) the prejudice caused to the defendant by the delay. *Barker*, 407 U.S. at 530; *Balderas*, 517 S.W.3d at 767; *Gonzales*, 435 S.W.3d at 808. Because these factors are related, no single factor alone is sufficient to establish a violation of the defendant's right to a speedy trial. *Barker*, 407 U.S. at 530, 533; *Cantu*, 253 S.W.3d

21

at 281; *Dragoo*, 96 S.W.3d at 313. Instead, the four *Barker* factors "must be considered together along with any other relevant circumstances" to determine whether a defendant has been deprived of the right to a speedy trial. *Cantu*, 253 S.W.3d at 281.

In balancing the parties' respective conduct, the State has the burden to justify the length of delay, while the defendant has the burden to prove that she effectively asserted her right and was in turn prejudiced. *Cantu*, 253 S.W.3d at 280 (citing *Barker*, 407 U.S. at 531); *see Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Crim. App. 1973). The defendant's burden of proof on factors three and four "varies inversely" with the State's degree of culpability for the delay. *Cantu*, 253 S.W.3d at 280. "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting [her] right to a speedy trial." *Id.* at 280–81.

The only possible remedy for a violation of the defendant's right to a speedy trial is the dismissal of the charging instrument with prejudice. *Strunk v. United States*, 412 U.S. 434, 440 (1973); *Cantu*, 253 S.W.3d at 281. Because dismissal of the pending charge is an extreme remedy, courts should apply and balance the *Barker* factors "with common sense and sensitivity to ensure that [a charge is] dismissed only when the evidence shows that a defendant's actual and *asserted* interest in *a speedy trial* has been infringed." *Cantu*, 253 S.W.3d at 281 (emphasis added). This is so because "[t]he constitutional right is that of a speedy trial, not [the] dismissal of the charges." *Id.*

The State contends that (1) there is no error to review because the trial court granted Appellant's motion for speedy trial, (2) Appellant failed to preserve error because she did not pursue an adverse ruling concerning the February 12, 2024 trial date, which was the setting that resulted from the grant of her motion for speedy trial, and (3) Appellant's right to a speedy trial was not violated under the *Barker*

22

factors. We disagree with the State's first two points but agree that, when considering and balancing all *Barker* factors together, Appellant's right was not violated as she suggests.

First, the State contends that there is no error to review because (1) the trial court granted Appellant's motion for speedy trial, scheduled her trial for February 12, 2024, rather than her requested date of December 11, 2023, and (2) Appellant did not object to the trial court's ruling. The State also contends that Appellant failed to preserve error under Rule 33.1 of the Texas Rules of Appellate Procedure because she did not pursue an adverse ruling regarding the February 12 trial date set by the trial court. *See* TEX. R. APP. P. 33.1; *Henson v. State*, 407 S.W.3d 764, 768–69 (Tex. Crim. App. 2013) (applying preservation requirements to speedy trial claims).

After the hearing on Appellant's speedy-trial motion, the trial court granted the motion and set Appellant's case for trial on February 12, 2024, rather than on the date requested by Appellant—December 11, 2023. The trial court's order did not grant the relief requested by Appellant as to a specific trial date but rather set a reasonably prompt trial date that was only approximately two months later than the date Appellant had requested. At the hearing, Appellant argued, and her motion stated, that the State's proffered reasons—scheduling conflicts—for setting her trial on February 12, 2024, rather than on December 11, 2023, were not reasonable, and maintained that her trial should be set for December 11. Appellant repeats those arguments in her brief. Consequently, we disagree with the State's contention that the complained-of error was not preserved for our review. *See* TEX. R. APP. P. 33.1; *Henson*, 407 S.W.3d at 768–69.

a. *Presumptive Prejudice and the Length of the Delay*

"The length of delay is a double inquiry: A court must consider whether the delay is sufficiently long to even trigger a further analysis under the *Barker* factors,

23

and if it is, then the court must consider to what extent it stretches beyond this triggering length." *Hopper*, 520 S.W.3d at 924. In most instances, the length of delay is measured from the date the defendant is arrested or formally charged until the date that trial commences or the defendant's formal demand for a speedy trial is asserted. *Marion*, 404 U.S. at 313; *Gonzales*, 435 S.W.3d at 809; *Shaw*, 117 S.W.3d at 889; *Zamorano*, 84 S.W.3d at 649 (the defendant's plea date was relied on to determine the date that the delay calculation should end); *Black v. State*, No. 02-21-00057-CR, 2022 WL 3464563, at *4 (Tex. App.—Fort Worth Aug. 18, 2022, no pet.) (mem. op., not designated for publication) (same). In the interest of justice, we calculate the length of the delay that encompasses the greatest possible period. *See Warren v. State*, No. 11-24-00153-CR, 2025 WL 2346892, at *3 (Tex. App.—Eastland Aug. 14, 2025, no pet.) (mem. op., not designated for publication) (citing *State v. Echols*, No. 11-19-00209-CR, 2021 WL 2174148, at *3 (Tex. App.—Eastland May 28, 2021, pet. ref'd) (mem. op., not designated for publication)); *State v. Davis*, 549 S.W.3d 688, 698 n.1 (Tex. App.—Austin 2017, no pet.); *see also Fuller v. State*, 624 S.W.3d 855, 863 (Tex. App.—Fort Worth 2021, pet. ref'd) ("Our calculation begins at the time Fuller was arrested and ends at the time of trial.").

The Supreme Court has held that, generally, a delay approaching one year is sufficient to trigger a *Barker* speedy-trial inquiry; however, the precise length of the delay that is needed to prove a speedy-trial violation depends on the facts and the complexity of the case. *See Doggett*, 505 U.S. at 652 n.1; *Barker*, 407 U.S. at 530–01; *Balderas*, 517 S.W.3d at 768. For example, "the delay that can be tolerated for an ordinary street crime is considerably less than for" a serious, complex case. *Barker*, 407 U.S. at 531. Further, "the presumption that pretrial delay has prejudiced the [defendant] intensifies over time." *Doggett*, 505 U.S. at 652. Thus, the longer the delay is beyond the triggering length, the more prejudicial the delay can be to the defendant. *Zamorano*, 84 S.W.3d at 649.

Relying on *Lopez v. State* and several other decisions from our sister courts of appeals, the State asserts that because Appellant agreed to three trial resets in 2023—from January 26 to March 16, from March 16 to April 20, and from April 20 to May 19, for a total of four months and twenty-three days of agreed-to delay—these time periods should be excluded from our delay calculation. *See Lopez v. State*, 478 S.W.3d 936, 943 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd); *Rodriguez v. State*, No. 13-23-00037-CR, 2024 WL 3708995, at *1–7 (Tex. App.—Corpus Christi–Edinburg Aug. 8, 2024, no pet.) (mem. op., not designated for publication); *Vadnais v. State*, No. 03-14-00578-CR, 2017 WL 474059, at *3 (Tex. App.—Austin Jan. 31, 2017, pet. ref'd) (mem. op., not designated for publication); *State v. Page*, No. 05-18-01391-CR, 2020 WL 1899453, at *6 (Tex. App.—Dallas Apr. 17, 2020, no pet.) (mem. op., not designated for publication).

The accumulated time from the date of Appellant's arrest to when her trial was called, and a jury was ultimately empaneled and sworn, was fifteen months and five days. If the parties' agreed resets are excluded from this calculation, as the State suggests, the delay was approximately ten and one-half months. The State contends that this is the proper calculation and does not exceed the one-year period that the courts have generally treated as presumptively prejudicial. Thus, because this case involved three complex, felony offenses that required the presentation of extensive medical evidence, the State reasons that a ten- and one-half-month delay is not prejudicial, and therefore it is not necessary for us to conduct a full *Barker* inquiry. We disagree.

Although the Court of Criminal Appeals has repeatedly held that any *delay* that is caused by the defendant weighs against finding a speedy-trial violation, it has done so in the context of discussing the delay element in conjunction with considering and evaluating the second *Barker* factor. *See, e.g.*, *Balderas*, 517 S.W.3d at 768. Nevertheless, incorporating the reasons for delay into the threshold

calculation of the delay's length would effectively shift the burden to the defendant to disprove that she, at the outset, contributed to the length of the delay. *See Gonzales*, 435 S.W.3d at 808 (stating that the defendant must make a threshold showing before the court is required to consider and weigh all *Barker* factors); *Cantu*, 253 S.W.3d at 280 (specifying that the State has the burden to justify the length of the delay).

The State's reliance on *Lopez* and the other authority it cites is misplaced. *Lopez*, and the line of cases of which it is a part, presents a confused application of the rule that "time covered by agreed resets is to be excluded from speedy trial consideration." *Lopez*, 478 S.W.3d at 942 & n.11 (quoting *Celestine v. State*, 356 S.W.3d 502, 507 (Tex. App.—Houston [14th Dist.] 2009, no pet.)); *see Richardson v. State*, 631 S.W.3d 269, 275 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (citing *Smith v. State*, 436 S.W.3d 353, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd)); *State v. Kuri*, 846 S.W.2d 459, 463 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) ("[A]greement to various resets is inconsistent with [the] assertion of a speedy trial right."); *Caicedo v. State*, 769 S.W.2d 597, 598 (Tex. App.—Houston [14th Dist.] 1989, no pet.); *Lewis v. State*, 686 S.W.2d 243 (Tex. App.—Houston [14th Dist.] 1985), *aff'd*, 711 S.W.2d 41 (Tex. Crim. App. 1986).

It is true that the above precedent from the Fourteenth Court of Appeals unequivocally supports the State's position. We are instead persuaded by the reasoning expressed by the First Court of Appeals in *Beck*. *See State v. Beck*, 695 S.W.3d 729, 741–44 (Tex. App.—Houston [1st Dist.] 2024, no pet.). The court in *Beck* thoroughly analyzed the proposition that agreed resets should be excluded from the calculation of the threshold showing of delay and rejected the proposition as

being inconsistent with its precedent as well as that of the Court of Criminal Appeals.[6] *Id.*

We, respectfully, agree with the First Court of Appeals' rationale in *Beck* that the rule, as stated in *Lopez* and its progeny, that "time covered by a defendant's agreed resets is to be excluded from speedy trial consideration" should not be followed *when it is applied to the calculation of the threshold showing of delay* (presumptive prejudice—the first *Barker* factor). *See id.* (quoting *Kurri*, 846 S.W.2d at 463). Rather, *the rule itself is properly applied* to the second *Barker* factor, which concerns and evaluates the reasons for the delay. *See id.* at 741 ("The Court [of Criminal Appeals] has repeatedly stated that delay caused by the [defendant] weighs against finding a speedy-trial violation, but it has done so in the context of discussing the second [*Barker*] factor of a complete speedy-trial analysis."); *Porter v. State*, 540 S.W.3d 178, 182 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)); *Warren*, 2025 WL 2346892, at *4 (citing *Munoz*, 991 S.W.2d at 822).

In fact, we address this point more thoroughly here only because it appears that the application of this rule by the courts that have subscribed to it has gone

---

[6]The court in *Beck* also examined the line of precedent cited by the State here and concluded that those cases are mistaken to the extent they support the proposition that agreed resets should be excluded from the threshold calculation of delay. *Id.* The court explained that the holdings of the two originating cases that established this line of precedent—*Caicedo* and *Lewis*—no longer provide a valid basis for this proposition. *Id.* at 742–44; *see Caicedo*, 769 S.W.2d at 598; *Lewis*, 686 S.W.2d at 244–45. The court reached this conclusion based on its reasoning that *Caicedo*'s holding was abrogated by the Court of Criminal Appeals in *Henson*, and that *Lewis* was based on the now-repealed Speedy Trial Act, which required exclusions of time attributable to agreed resets from statutory speedy-trial claims. *Beck*, 695 S.W.3d at 742–44 ("*Caicedo*'s holding—that an accused who makes a speedy-trial motion in the trial court can nonetheless waive the issue by agreeing to resets—cannot be squared with *Henson*'s conventional error-preservation analysis."); *compare Henson*, 407 S.W.3d at 768–69 *with Caicedo*, 769 S.W.2d at 598; *see Lewis*, 686 S.W.2d at 244–45; *see also Robinson v. State*, 707 S.W.2d 47, 49–50 & n.2 (Tex. Crim. App. 1986) (explaining that agreed resets were the equivalent to continuances and thus were not included in the threshold delay calculations because the Speedy Trial Act excluded time attributable to requested and agreed continuances from the statutory deadlines).

largely unnoticed: although some courts have routinely applied the rule correctly, albeit in the wrong context, in doing so they have cited to *Lopez* or other cases that, we believe, stand for the rule's incorrect application. *See, e.g.*, *State v. Uhl*, 717 S.W.3d 117, 133 (Tex. App.—Austin 2025, pet. ref'd) (citing *Richardson*, 631 S.W.3d at 275). Even *Page*, which the State cites and relies upon in support of its assertion, correctly applies the rule yet cites to *Lopez*.[7] *See Page*, 2020 WL 1899453, at *6. Thus, under this rule, when properly applied, any time that is attributable to agreed resets does not weigh against the State at all. *See Uhl*, 717 S.W.3d at 133; *Fuller*, 624 S.W.3d at 865; *see also Beck*, 695 S.W.3d at 745.

Here, the length of the delay from the date of Appellant's arrest to when the jury for her case was ultimately empaneled and sworn was fifteen months and five days, which is indeed beyond the one-year period that is generally deemed to be presumptively prejudicial. *See Balderas*, 517 S.W.3d at 768. When the complained-of period exceeds the one-year minimum that is required to trigger such a *Barker* review, as it does here, this factor (presumptive prejudice) generally weighs against the State. *See Zamorano*, 84 S.W.3d at 649; *Fuller*, 624 S.W.3d at 864; *see also Barringer v. State*, 399 S.W.3d 593, 600 (Tex. App.—Eastland 2013, no pet.); *Schuman v. State*, No. 11-22-00300-CR, 2024 WL 847692, at *8 (Tex. App.—Eastland Feb. 29, 2024, pet. ref'd) (mem. op., not designated for publication). Nevertheless, to determine whether there has been a speedy-trial violation, all *Barker* factors must be weighed and balanced together. *See Cantu*, 253 S.W.3d at 281.

---

[7]The other cases cited by the State fare no better: *Vadnais* relies on *Lopez*, and *Rodriguez* does not involve a speedy-trial violation. *See Rodriguez*, 2024 WL 3708995, at *1–7; *Vadnais*, 2017 WL 474059, at *3.

b. *The Reason(s) for the Delay*

The second *Barker* factor requires the trial court to review the State's reason(s) or justification for the delay. *Barker*, 407 U.S. at 531. Under *Barker*, different reasons for the delay are assigned different weights. *Balderas*, 517 S.W.3d at 768; *Munoz*, 991 S.W.2d at 822. Deliberate attempts to delay proceeding to trial should weigh heavily against the State, while a valid reason or reasons for a delay should not. *Balderas*, 517 S.W.3d at 768; *Munoz*, 991 S.W.2d at 822. A more neutral reason, such as official negligence or overcrowded trial dockets, is afforded less weight but, nevertheless, may weigh against the State, because the ultimate responsibility for proceeding to trial expeditiously rests with the State. *Barker*, 407 U.S. at 531; *Balderas*, 517 S.W.3d at 768; *Zamorano*, 84 S.W.3d at 650–51.

The State has the burden to provide a valid reason or reasons that would excuse the delay. *Turner v. State*, 545 S.W.2d 133, 137–38 (Tex. Crim. App. 1976). Although an "unexplained" delay may weigh heavily against the State in some instances, *Gonzales*, 435 S.W.3d at 810, if no evidence is presented by the defendant that such a delay on behalf of the State was *deliberate*, this factor will weigh against the State, but not heavily. *Zamorano*, 84 S.W.3d at 649–51. Further, any delay that is caused by or attributable to the defendant or defendant's trial counsel generally weighs against the defendant. *See Munoz*, 991 S.W.2d at 822; *Fuller*, 624 S.W.3d at 863–66; *see also Beck*, 695 S.W.3d at 741–44.

Appellant was arrested on December 13, 2022. Appellant and her trial counsel signed and approved three agreed-reset "pass slips"—which have the effect of rescheduling case events to a later date—on January 26, 2023, March 16, 2023, and April 20, 2023. These "passes" total four months and twenty-three days of agreed-to delay.

On September 28, 2023, Appellant filed her motion for speedy trial and requested that her trial commence on December 11, 2023. The trial court held a

29

hearing on Appellant's pending motions on October 17. Appellant's motion to suppress was set and heard over three separate days between May 19 and September 18, 2023. The State does not offer any reasons to explain the delays between May 19 and September 28, it simply points out that the motion to suppress was heard on those dates; however, the hearing was continued several times. Unexplained delays weigh against the State, but only slightly. *Zamorano*, 84 S.W.3d at 649–51.

When the State offered the parties agreed-reset documents to the trial court at the hearing on Appellant's motion for speedy trial, Appellant explicitly declined to object to or assert that these resets were not agreed to by the parties. In fact, they were. Moreover, after a jury could not be seated and sworn when Appellant's case was first called for trial on February 12, 2024, despite the efforts of all involved, the trial court reset Appellant's trial to March 18, 2024. Appellant's trial counsel then stated: "Just to put it on the record, we're not waiving anything with regard to speedy trial. We won't sign any pass slips." The trial court acknowledged this refusal and stated: "So we will enter a pass slip. It just won't have your signature, but just so it will be on file that that's known when we're scheduling." We cannot ignore, and it is clear, that the resets leading up to the February 12, 2024, trial setting were agreed to by the parties. *See Beck*, 695 S.W.3d at 745 (holding that the evidence did not support the State's assertion that the defendant agreed to each reset when the trial court stated in its findings of fact and conclusions of law that its policy was to require parties to sign reset forms to acknowledge receipt of notice of the reset, and the evidence did not refute that finding); *Ussery v. State*, 596 S.W.3d 277, 284 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) (noting that the trial court discounted reset forms that stated they were agreed because all its forms say so, even when they are not, and holding that the record did not support the State's position that the accused agreed to the resets). As such, the time attributable to the agreed resets is

discounted from our analysis on the second *Barker* factor and the speedy trial delay calculation. *See Uhl*, 717 S.W.3d at 133; *Porter*, 540 S.W.3d at 182; *see also Beck*, 695 S.W.3d at 741–44.

During the hearing on the motion for speedy trial, the State offered the prosecutors' trial schedules that showed their availability for jury trial settings, the cases that were set on dates where the defendants were confined and awaiting trial, and the three agreed reset documents that were signed and approved by Appellant and her trial counsel. The State also discussed the multiple prior hearings held by the trial court on Appellant's motion to suppress, the discovery that was conducted in the case, and the need to schedule the trial on a date on which there were no conflicts. The trial court accepted the State's recommended trial date and set Appellant's trial for February 12, 2024. Despite the State's arguments and proffers, Appellant did not offer any evidence of *deliberate* or intentional actions by the State to delay Appellant's trial. Any delay because other cases were set to proceed to trial sooner than Appellant's case is a circumstance that is attributable to a neutral reason that weighs against the State, but only slightly. *See Wickware v. State*, No. 12-22-00180-CR, 2023 WL 5666218, at *5 (Tex. App.—Tyler Aug. 31, 2023, no pet.) (mem. op., not designated for publication); *Reitz v. State*, No. 06-18-00088-CR, 2019 WL 961515, at *3 (Tex. App.—Texarkana Feb. 29, 2019, no pet.) (mem. op., not designated for publication) (holding a court coordinator's statement that the next available trial date was three months away was an indication that part of the delay was due to overcrowded courts, a neutral reason) (citing *Shaw*, 117 S.W.3d at 890).

As previously mentioned, after a jury could not be seated and sworn on February 12, 2024, the trial court reset Appellant's trial to March 18 over Appellant's objection. Delay that is attributable to overcrowded trial dockets and administrative conflicts is also a neutral reason that weighs against the State, but only slightly. *See Uhl*, 717 S.W.3d at 133 (citing *Shaw*, 117 S.W.3d at 890); *see also Zamorano*, 84

S.W.3d at 650–51.  Nevertheless, the length of delay of which Appellant complains here is significantly less than the three-year to eight-year delays that the Court of Criminal Appeals has held weigh "heavily" against the State.  *See Balderas*, 517 S.W.3d at 768 (eight-year delay); *Dragoo*, 96 S.W.3d at 314 (delay of three and one-half years); *Zamorano*, 84 S.W.3d at 649.  Rather, the delay in this case is essentially identical to the fifteen and one-half month delay that we recently addressed in *Warren* and concluded did not constitute a speedy-trial violation.  *See* 2025 WL 2346892, at \*4.

We conclude, based on the circumstances presented, that the second *Barker* factor—the reason(s) for the delay—is a neutral reason that weighs neither for nor against either party.  Here, a significant portion of the delay was attributable to the parties' agreed resets, and the remaining delays were exclusively due to neutral or unexplained reasons.  *See Thames v. State*, No. 02-17-00295-CR, 2019 WL 237556, at \*8 (Tex. App.—Fort Worth Jan. 17, 2019, no pet.) (mem. op., not designated for publication) (holding that this factor was neutral given that the agreed resets and other factors indicated that the parties "were equally to blame for the delay in the case").  Moreover, there is no evidence that the State *deliberately* attempted to delay the prosecution of Appellant's case.  *See Dragoo*, 96 S.W.3d at 314 (explaining that any delay weighs against the State if not justified but that, to weigh heavily, there must be evidence of a "*deliberate* attempt on the part of the State to prejudice the defense") (emphasis added); *see also Barringer*, 399 S.W.3d at 600.

c.  *Appellant's Assertion of Her Right to a Speedy Trial*

A defendant's assertion of her right to a speedy trial is entitled to strong evidentiary weight in determining whether the defendant was deprived of that right.  *Barker*, 407 U.S. 531–32.  It is well-settled that the State bears the burden to promptly bring the defendant to trial, but the defendant nonetheless has the burden to prove that she effectively *asserted* her right *to a speedy trial*.  *Munoz*, 991 S.W.2d

at 825; *Davis*, 549 S.W.3d at 704; *Barringer*, 399 S.W.3d at 599. The defendant's burden to establish her assertion of the right "varies inversely with the State's degree of culpability for the delay." *Fuller*, 624 S.W.3d at 863 (citing *Cantu*, 253 S.W.3d at 280–81).

A demand for a speedy trial should be an unambiguous assertion that is clear enough to convey to the trial court or the State that the defendant is asserting this right. *Davis*, 549 S.W.3d at 704 (citing *Henson*, 407 S.W.3d at 769); *Bailey v. State*, 885 S.W.2d 193, 201 (Tex. App.—Dallas 1994, pet. ref'd). As the length of the delay increases, a defendant who is diligent and desires to have a speedy trial is, and should be, more likely to take some action to assure that her trial commences promptly; thus, "inaction weighs more heavily against a violation the longer the delay becomes." *Balderas*, 517 S.W.3d at 771; *Dragoo*, 96 S.W.3d at 314 (quoting George E. Dix & Robert O. Dawson, 42 *Texas Practice Series: Criminal Practice & Procedure* § 23.40 (2d ed. 2001)).

Importantly, "[t]he constitutional right is that of a speedy trial, not [to the] dismissal of the charges." *Cantu*, 253 S.W.3d at 281. Filing a motion to dismiss and requesting that the trial court dismiss the pending charges based on an alleged speedy-trial violation, as opposed to filing a motion for speedy trial that instead requests a prompt trial setting, attenuates the strength of a speedy-trial complaint because it creates an inference that the defendant prefers no trial at all, rather than a speedy one. *Id.*; *Phillips v. State*, 650 S.W.2d 396, 401 (Tex. Crim. App. [Panel Op.] 1983); *Stiles v. State*, 596 S.W.3d 361, 367–68 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd).

Appellant filed her motion for speedy trial on September 28, 2023, nine months and six days after her arrest. The State contends that there can be no speedy-trial violation because (1) Appellant made her speedy-trial request only after the parties had agreed to three trial resets and three hearing dates on Appellant's motion

33

to suppress, and (2) her case proceeded to trial within five months of her request. Therefore, the State argues, this *Barker* factor should weigh against Appellant. We agree.

As stated above, Appellant's speedy trial demand was made approximately nine and one-half months after her arrest. Of that time, over four months of delays were attributable to agreed trial resets. This undermines and dilutes Appellant's contention that she vigorously pursued a speedy trial. *See Dragoo*, 96 S.W.3d at 314 ("[T]he longer [the] delay becomes, the more likely a defendant who wished a speedy trial would be to take some action to obtain it."); *Shaw*, 117 S.W.3d at 890 ("[A] defendant's failure to make a timely demand for a speedy trial indicates strongly that he did not really want one and that he was not prejudiced by not having one."). Excluding the parties' three agreed resets, Appellant's case proceeded to trial, and a jury was empaneled and sworn, eleven months and eighteen days after her arrest, and five months and twenty days after she made her request for a speedy trial. Furthermore, neither Appellant nor her trial counsel demanded an immediate trial setting when they signed and approved the three trial "reset forms" and agreed, each time, to Appellant's trial date being rescheduled. Such circumstances are not indicative of a speedy-trial violation and dilute such a complaint. *See Barker*, 407 U.S. at 534–35; *Balderas*, 517 S.W.3d at 771; *Cantu*, 253 S.W.3d at 283; *Warren*, 2025 WL 2346892, at *6–7; *Black*, 2022 WL 3464563, at *8–10.

Moreover, even though the trial court granted Appellant's motion for a speedy trial, and despite having been granted the relief that she requested, one week later (on February 20, 2024) she filed a motion to dismiss based on the alleged violation of her right to a speedy trial; the trial court denied this motion the same day. However, moving for dismissal, as Appellant did in this instance, is only appropriate in circumstances when defense counsel reasonably and legitimately believes that a *lengthy* delay has resulted in prejudice to the defendant. *See Phillips*, 650 S.W.2d at

34

401. There is no evidence here to support such a claim. Indeed, as the courts have held, moving for a dismissal of the pending charges dilutes a speedy-trial complaint because it creates an inference that the defendant prefers no trial at all, rather than a speedy one. *Id.*

We conclude that this *Barker* factor weighs against Appellant. She agreed to and approved three resets of her trial date—totaling over four months of agreed-to delays—before she asserted her speedy-trial right. Texas courts have consistently held that this "quiet acquiescence," *Beck*, 695 S.W.3d at 746–47, is strong evidence that the defendant was not prejudiced by the delay and "did not really want" a speedy trial in the first instance. *Shaw*, 117 S.W.3d at 890; *see Voda v. State*, 545 S.W.3d 734, 742–43 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Dragoo*, 96 S.W.3d at 315).

d. *Prejudice to Appellant*

The final *Barker* factor requires that we determine whether, and to what extent, the defendant suffered prejudice because of the delay. *Barker*, 407 U.S. at 532. We assess the weight of any prejudice by considering the interests that the right to a speedy trial was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize the defendant's anxiety and concern, if any; and (3) to limit the possibility that the defendant's defense would be impaired. *Id.* Of these factors, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*; *Balderas*, 517 S.W.3d at 772. However, the impairment of one's defense is the "most difficult form of speedy trial prejudice to prove." *Doggett*, 505 U.S. at 655.

Under this factor, the defendant has the burden to make a showing of *some* prejudice, although a showing of "actual prejudice" is not required. *Balderas*, 517 S.W.3d at 772. If the defendant makes a prima facie showing of prejudice, the burden shifts to the State to prove that the defendant suffered "no serious prejudice

beyond that which ensued from [an] ordinary and inevitable delay." *McKenzie*, 491 S.W.2d at 123; *see Cantu*, 253 S.W.3d at 280–81. However, "[e]vidence of generalized anxiety, though relevant, is no sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation." *Sample v. State*, 653 S.W.3d 287, 292 (Tex. App.—Austin, 2022, pet. ref'd) (citing *Cantu*, 253 S.W.3d at 286). There must be proof of a specific degree of anxiety that demonstrates prejudice. *See Zamorano*, 84 S.W.3d at 654.

We note that proof of a particularized prejudice is not essential in every case because "*excessive* delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655 (emphasis added); *see Shaw*, 117 S.W.3d at 890. On the other hand, the presumption of prejudice is extenuated by the defendant's conduct and acquiescence in the delay, as it is here. *Doggett*, 505 U.S. at 658; *Dragoo*, 96 S.W.3d at 315.

Appellant generally asserts, without a showing of any specific instances, that the complained-of delay made her anxious and concerned. She further contends that "[w]itnesses that would have aided Appellant were also becoming unavailable" and in support cites to her motion for speedy trial, which makes the same bare assertion. However, at the hearing on her motion, Appellant's trial counsel did not mention or claim that the delay had caused any potential witness to be unavailable for trial. Despite her contentions, no evidence was presented at the hearing, and she has not pointed to or directed us to any evidence in the record to support or develop either argument. *See* Tex. R. App. P. 38.1(f), (h), (i); *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017) ("[A]n appellate court has no 'obligation to construct and compose [an] appellant's issues, facts, and arguments with appropriate citations to authorities and to the record.'") (quoting *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008)). Instead, Appellant's briefing and arguments present only a

36

superficial showing of her alleged generalized anxiety over her potential incarceration. This is insufficient to show prejudice under the fourth *Barker* factor.

Here, there is nothing in the record to indicate that Appellant was prejudiced in any substantive manner, if at all, by the delay. Therefore, because Appellant failed to meet her burden to show that she was prejudiced, we conclude that the fourth *Barker* factor weighs against her.

### e. *Balancing the Factors*

As it has been said, we must weigh and balance the *Barker* factors together "with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Balderas*, 517 S.W.3d at 773 (quoting *Cantu*, 253 S.W.3d at 281). We must also give due deference to the trial court's ruling and any reasonable inferences that find support in the record. *Id.* at 767–68. Based on the record before us, when we consider, weigh, and balance all *Barker* factors together, and the scant evidence that was presented to the trial court, we cannot say that Appellant's right to a speedy trial was violated. *See Barker*, 407 U.S. at 534–36; *Cantu*, 253 S.W.3d at 282; *Zamorano*, 84 S.W.3d at 648; *Warren*, 2025 WL 2346892, at *9. Therefore, we conclude that the trial court did not abuse its discretion when it denied Appellant's motion to dismiss. *See Uhl*, 717 S.W.3d at 142 (reversing the trial court's grant of a motion to dismiss based in substantial part on the appellant's acquiescence and lack of prejudice showing); *Fuller*, 624 S.W.3d at 868.[8]

---

[8]*See Warren*, 2025 WL 2346892, at *4 (a sixteen and one-half month delay between the defendant's arrest and the date of the hearing on the defendant's motion to dismiss did not result in a speedy-trial violation); *Schuman*, 2024 WL 847692, at *9–12 (an eighteen month delay did not result in a speedy-trial violation); *Lowe v. State*, No. 11-15-00094-CR, 2017 WL 2588210, at *6–7 (Tex. App.—Eastland Apr. 28, 2017, no pet.) (mem. op., not designated for publication) (a thirty-five-month delay did not result in a speedy-trial violation); *Torres v. State*, No. 11-13-00172-CR, 2015 WL 4438051, at *3 (Tex. App.—Eastland July 16, 2015, no pet.) (mem. op., not designated for publication) (an almost seven-year delay between indictment and the commencement of trial did not result in a speedy-trial violation); *see also Barringer*, 399 S.W.3d at 600–02 (an eight-year delay did not constitute a speedy-trial violation).

Accordingly, we overrule Appellant's first issue.

B. *Sufficiency of the Evidence*

In her second and third issues, Appellant challenges the legal and factual sufficiency of the evidence to support her convictions.

1. *Standard of Review*

At the outset, we note that the distinction between the legal and factual sufficiency standards of review has long since been abandoned. *See Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 289 (Tex. App.—Eastland 2010, pet. ref'd) ("Accordingly, a challenge to the factual sufficiency of the evidence is no longer viable.").

Thus, we review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks*, 323 S.W.3d at 912; *Polk*, 337 S.W.3d at 288–89. Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). As such, we defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* CRIM. PROC. art. 36.13 (West 2007); *Garcia*, 667

S.W.3d at 762 ("[A] reviewing court does not sit as the thirteenth juror and may not substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence."); *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Dewberry v. State*, 4 S.W.3d 735, 74 (Tex. Crim. App. 1999). This deference accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *Clayton*, 235 S.W.3d at 778. Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Ruiz v. State*, 631 S.W.3d 841, 851 (Tex. App.—Eastland 2021, pet. ref'd). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish the defendant's guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13); *Lee*, 676 S.W.3d at 915. A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt if the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13.

Finally, we measure the sufficiency of the evidence by the elements of the charged offense(s) as defined by the hypothetically correct charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In this regard, to determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt under the *Jackson* standard, we compare the elements of the offense(s) to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik*, 953 S.W.2d at 240). The hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240. For result-oriented offenses, such as injury to a disabled individual, the manner and means is not included in the hypothetically correct charge and consequently "should be disregarded in a *Jackson* sufficiency analysis." *Hernandez v. State*, 556 S.W.3d 308, 326–27 (Tex. Crim. App. 2017).

### 2. *Application*

As we have said, we will analyze Appellant's sufficiency arguments only under the *Jackson* legal sufficiency standard.[9] *See Brooks*, 323 S.W.3d at 912 (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)).

Appellant contends, globally, that the evidence is insufficient to support her convictions and the maximum sentences that were imposed because several

---

[9]Appellant's briefing of her legal sufficiency issue is woefully sparse; it consists of approximately three pages of the brief, much of which are filled with a large header that restates the issue and paragraphs that set forth the standard of review. Half of one page is left blank. The entirety of Appellant's application and argument section consists of a single, short, paragraph that asserts (1) K.A. and Lyr. A. lied, and (2) Dr. Andrews's autopsy report listed the cause of death as an eating disorder not otherwise specified. Two blank pages follow this paragraph before the brief concludes with Appellant's prayer for relief. Liberally construing the applicable rules of appellate procedure, this level of briefing is barely acceptable. *See* TEX. R. APP. P. 38.1(i). We do, however, consider the evidence addressed in her factual sufficiency arguments under the established legal sufficiency standard. *See Brooks*, 323 S.W.3d at 912.

witnesses testified that Appellant had never hit L.A., and Dr. Andrews's autopsy report stated that L.A.'s cause of death was an "eating disorder not otherwise specified."

As relevant to the charged offenses in this case,[10] a person commits the offense of injury to a disabled individual if, by her acts, she intentionally, knowingly, or with criminal negligence causes bodily injury to a disabled individual. PENAL § 22.04(a)(3). A person commits the same offense by omission if she intentionally or knowingly causes serious bodily injury to a disabled individual. *Id.* § 22.04(a)(1). A person acts intentionally with respect to the result of her conduct when it is her conscious objective or desire to cause the result. *Id.* § 6.03(a) (West 2021). A person acts knowingly with respect to the result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A person is criminally negligent with respect to the result of her conduct when she should be aware of a substantial and unjustifiable risk that the result will occur. *Id.* § 6.03(d). The risk must be of such degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances when viewed from the standpoint of the actor. *Id.*

The first two offenses required proof that Appellant, by her actions, intentionally or knowingly caused bodily injury to L.A. (by striking L.A. with her hand), and caused bodily injury to L.A. with criminal negligence (by striking L.A. with her foot). Appellant contends that the evidence is insufficient to support her convictions because "several witnesses indicated Appellant had never hit [L.A.]," "that the convictions were based on testimony from child witnesses that was at a minimum confusing, and blatant lies, and made up," and the child witnesses' statements "were not only not corroborated by older witnesses, they were actually

---

[10]Because Appellant's briefing focuses on the weight and credibility of witness testimony regarding whether Appellant beat and starved L.A., our analysis reflects the same focus. TEX. R. APP. P. 38.1(i).

41

called out as being nontruths." As for the third offense, which alleged that Appellant intentionally or knowingly caused serious bodily injury to L.A. by omission, Appellant contends that the original autopsy report prepared by Dr. Andrews stated that L.A.'s cause of death was an eating disorder not otherwise specified, and therefore a rational trier of fact could not have reasonably found that the evidence supported each element of this offense. We disagree.

Here, the evidence adduced by the State of the prolonged and agonizing abuse endured by L.A. is compelling and we need not repeat the unfortunate and egregious details of it that are recited above. Nevertheless, with respect to the first two offenses, the evidence admitted at trial included, among other things, statements provided by K.A. to CPS investigators that Appellant had punched L.A. causing her to sustain a "black eye." K.A. repeated this allegation when he testified at trial. Lyr. A. testified that Appellant and Anderson repeatedly beat and physically abused L.A. because they did not like her. Heavener observed that L.A. had a black eye and other bruises when she was admitted to the hospital on the day she passed. Dr. Crowns and Dr. Dakil reviewed L.A.'s autopsy and medical records and observed, after examining her body, that she had a black eye, amidst numerous other injuries to her body, an injury to the top of her foot, which neither, according to them, could be attributable to L.A. falling in the manner that Anderson and Appellant had described. K.A. testified that he saw marks "everywhere" on L.A. and that Anderson and Appellant "hurt" her. K.A. and Lyr. A. also testified that Anderson and Appellant "whoop[ed]" and "hit" L.A. numerous times.

With respect to the third offense, the evidence showed that although Dr. Andrews performed the original autopsy and opined that the cause of L.A.'s death was an eating disorder not otherwise specified, Dr. Crown and Dr. Dakil reviewed these autopsy findings and disagreed with Dr. Andrews's conclusions. They engaged in a thorough review of L.A.'s autopsy after other evidence emerged,

42

namely the statements by K.A. that Appellant and Anderson (1) deprived L.A. of food and other sources of nutrition and (2) repeatedly abused her. In addition to K.A.'s testimony and the opinions of Dr. Crown and Dr. Dakil, several other witnesses testified that L.A. died because of starvation while under the care and supervision of Appellant and Anderson.

Although Appellant emphasizes that evidence from witnesses that she presented at trial controverted the State's evidence, the jury was free to believe all, some, or none of any witness's testimony. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Reyes v. State*, 465 S.W.3d 801, 805 (Tex. App.—Eastland 2015, pet. ref'd) (citing *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)); *see Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d 899. As the trier of fact, it is the jury's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. 326; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. Therefore, if the evidence supports conflicting inferences, and because we may not reweigh the evidence or substitute our judgment for the jury's, we presume that the jury resolved any conflicts in the evidence in favor of its verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762; *Winfrey*, 393 S.W.3d at 768; *Merritt*, 368 S.W.3d 525–26; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778.

We have reviewed the evidence in the light most favorable to the jury's verdicts under the applicable standard of review, as we must, and we conclude that the record before us contains sufficient evidence from which a rational trier of fact could have logically inferred and found beyond a reasonable doubt the essential elements of the offenses for which Appellant was convicted. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761.

Accordingly, we overrule Appellant's second and third issues.

43

## IV.  *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE


January 15, 2026

Publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.